530 S.E.2d 643

Senator Phil LEVENTIS; Citizens Asking for a Safe Environment; and Laidlaw Environmental Services of South Carolina, Inc., formerly GSX Services of South Carolina, Inc., separately as, Petitioners,

v.

SOUTH CAROLINA DEPARTMENT OF HEALTH AND ENVIRONMENTAL CONTROL and South Carolina Board of Health and Environmental Control, Respondents,

Energy Research Foundation; County of Sumter; Sierra Club; South Carolina Public Service Authority (Santee Cooper); South Carolina Wildlife and Marine Resources Department; and Clarendon County, Intervenors.

In Re Financial Responsibility Determination: GSX Services of South Carolina, Pinewood Facility, Sumter County, South Carolina, RCRA Permit Decision: GSX Services of South Carolina, Inc., Hazardous Waste Permit SCD 070 375 985,

of whom Senator Phil Leventis; Citizens Asking for a Safe Environment; Sierra Club; and Energy Research Foundation are, Primary Appellants, and

South Carolina Department of Natural Resources, formerly South Carolina Wildlife and Marine Resources Department; South Carolina Public Service Authority (Santee Cooper); County of Sumter; and Laidlaw Environmental Services of South Carolina, Inc., formerly GSX Services of South Carolina, Inc., are Secondary Appellants.

Court of Appeals of South Carolina.

Heard Sept. 9, 1999.

Filed Jan. 17, 2000.

Refiled April 4, 2000.

120

Robert Guild; Robert T. Bockman and Deborah A. Hottell, both of McNair Law Firm; James L. Werner, of Ellzey & Brooks, all of Columbia; and M.M. Weinberg, Jr., of Weinberg, Brown, McDougall & McMillan; Kathy W. Cuttino and Senator Phil P. Leventis, all of Sumter; and James Andrew Quinn, of SC Department of Natural Resources; and William LeRoy Want, both of Charleston; and John H. Tiencken, Jr., of Moncks Corner; and James S. Chandler, Jr., of Pawleys

Island; and James M. Kuszaj, of Ogletree, Deakins, Nash, Smoak & Stewart, of Raleigh, NC, for appellants.

John S. Simmons, of Griffin & Lydon; and Jacquelyn S. Dickman, of South Carolina Department of Health and Environment Control Office of General Counsel, both of Columbia, for respondents.

## ORDER GRANTING PETITION FOR REHEARING IN PART, DENYING IN PART, AND SUBSTITUTING OPINION

PER CURIAM:

Pursuant to Secondary Appellant Laidlaw's Petition for Rehearing, it is ordered that the opinion heretofore filed, Opinion No. 3103, heard September 9, 1999, and filed January 17, 2000, be withdrawn and the attached Opinion be substituted. Secondary Appellant Laidlaw's petition for rehearing is granted, but further oral argument is denied. After careful consideration of Primary Appellants' and the remaining Secondary Appellants' Petitions for Rehearing, the Court is unable to discover any material fact or principle of law that has been either overlooked or disregarded and, hence, there is no basis for granting a rehearing. It is, therefore, ordered that the Primary Appellants' and remaining Secondary Appellants' Petitions for Rehearing be denied.

HEARN, Chief Judge:

Senator Phil P. Leventis, Sierra Club, and six other non-profit organizations (collectively Sierra Club) appeal the South Carolina Department of Health and Environmental Control's (DHEC) issuance of a permit granting Laidlaw Environmental Services of South Carolina authority to operate a hazardous waste disposal facility located near Pinewood, South Carolina (Pinewood Facility). Laidlaw appeals certain conditions imposed by the permit. We affirm in part, reverse in part, and vacate in part.

## FACTS

In 1977, Bennett Mineral Company (BMC) mined materials used to produce "kitty litter" and other absorbent materials

from land now known as the Pinewood Facility. When BMC completed mining operations, it became responsible for reclaiming the mined areas. To satisfy this obligation, and because the site still contained absorbent materials, BMC applied for a permit to operate a waste disposal facility.

In November 1977, DHEC issued BMC Industrial Waste Permit (IWP)–145 to fill the mined areas with industrial waste. DHEC issued the permit without providing a public notice or hearing[1] and prior to the promulgation of either state or federal regulations governing such facilities. The IWP–145 omitted an explicit expiration date or capacity limit. After receiving the permit, BMC conducted limited disposal activity, primarily disposing of liquid industrial waste.

In April 1978, William Stilwell, Jr., a former DHEC employee, incorporated South Carolina S.C.A. Services, Inc. (SCA). SCA purchased the Pinewood Facility, including a transfer of IWP–145, from BMC. DHEC never required a public notice, comment, hearing, or adjudication prior to transferring the permit. On July 11, 1979, DHEC extended IWP–145 after conducting public meetings and a joint public hearing with the Environmental Protection Agency (EPA).

In March 1980, the South Carolina General Assembly approved South Carolina's hazardous waste management regulations. In accordance with these regulations, on September 25, 1980, SCA submitted its part A application for a permit to operate a hazardous waste disposal facility.[2] Submitting the application qualified SCA for interim status to operate the

---

1. No regulations required a public notice or hearing at the time DHEC initially issued IWP–145. In 1991, the South Carolina Supreme Court held that "constitutional due process provisions, apart from the APA, are sufficient to confer the rights to notice and for an opportunity to be heard." *Stono River Envtl. Protection Ass'n v. South Carolina Dep't. of Health and Envtl. Control,* 305 S.C. 90, 94, 406 S.E.2d 340, 342 (1991) (citing S.C. Const. art. I, § 22). However, DHEC was unaware of this ruling in 1977 when it issued the initial permit without notice or a hearing and neither party properly argued that the *Stono River* case should apply retroactively. *See Bochette v. Bochette,* 300 S.C. 109, 112, 386 S.E.2d 475, 477 (Ct.App.1989) (holding an appellant may not use a reply brief to raise issues not argued in the initial brief).

2. Because DHEC and the EPA conducted their permitting procedures jointly, SCA also submitted an application with the EPA on November 17, 1980.

hazardous waste facility. Subsequently, Laidlaw Environmental Services of South Carolina purchased SCA.[3]

In response to Laidlaw's permit application, DHEC issued a draft permit and gave notice of a public hearing. Over 2500 people attended the hearing held in November 1988.[4] DHEC subsequently prepared a response to the oral and written comments received from the hearing and, after reviewing the comment record, application, and compliance history, DHEC concluded Laidlaw would operate the Pinewood Facility in accordance with the relevant rules and regulations while protecting the public health and environment. On July 27, 1989, DHEC issued Laidlaw a final hazardous waste permit effective September 1, 1989.

Also on July 27, 1989, DHEC issued a draft financial responsibility determination. The draft required Laidlaw to maintain a $30,000,000 environmental impairment liability insurance policy for third party property and bodily injury coverage. The draft also required Laidlaw to maintain a $114,250,000 trust fund for cleanup costs and environmental restoration necessitated by the Pinewood Facility's operations. The trust fund required a minimum $11,425,000 initial payment.

On June 22, 1992, DHEC issued a final financial responsibility determination requiring Laidlaw to maintain a $33,588,431 environmental impairment liability insurance policy and a $132,885,373 trust fund with a minimum $14,765,041 initial payment.

Laidlaw challenged numerous conditions set forth in the final permit and financial responsibility determination. Energy Foundation, Citizens Asking for a Safe Environment (C.A.S.E.), and Sierra Club challenged the final permit's issuance and financial responsibility determinations. Santee Cooper intervened to support DHEC's financial responsibility

---

**3.** Genstar Corporation, which later changed its name to GSX Services of South Carolina, actually purchased SCA. GSX later changed its name to Laidlaw Environmental Services of South Carolina, Inc. In the midst of this action, Laidlaw again changed its name to Safety Kleen. For clarity, we refer to the entity as Laidlaw throughout this opinion.

**4.** From 1980 until 1988, federal and state regulations underwent repeated alterations resulting in this protracted permitting procedure.

determination. An adjudicatory hearing was scheduled to address these contentions.

Prior to the scheduled hearing, Laidlaw and DHEC entered into a stipulated agreement providing in pertinent part as follows. First, Laidlaw agreed to provide $30,000,000 in financial assurance for third party liability. Second, Laidlaw agreed to provide an environmental impairment fund, which, when combined with the State Permitted Sites Fund, amounted to $100,000,000. The impairment fund consisted of a corporate guarantee by Laidlaw's Canadian parent corporation and a trust fund established through Laidlaw's contributions based on the amount and type of waste disposed. Third, the agreement established a 2250 acre-foot[5] hazardous waste capacity limit and, ostensibly under IWP–145, a 2461 acre-foot nonhazardous waste capacity limit. Fourth, DHEC and Laidlaw agreed to abide by and support the stipulated agreement in subsequent judicial and quasi-judicial challenges.

In light of the stipulated agreement, Laidlaw withdrew its objections to the final permit, submitted documentation substantiating its corporate guarantee, and withdrew as a complaining party. Thereafter, Sierra Club amended its pleadings to contest the stipulated agreement.

Following an extensive hearing, the hearing examiner recommended upholding DHEC's decision to issue Laidlaw the final permit "as clarified, updated, explained, revised and/or amended by the Stipulated Agreement." The hearing examiner further recommended upholding as proper and adequate the financial assurances established in the stipulated agreement. Sierra Club appealed to the DHEC Board.

On review, the DHEC Board found Sierra Club failed to prove DHEC erred in issuing the permit. However, the DHEC Board found Sierra Club established, by a preponderance of the evidence, that the stipulated agreement's provisions on capacity and financial assurances must be modified. The Board ruled *all* waste disposed at the Pinewood Facility, hazardous and nonhazardous, should count towards the final permit's 2250 acre-foot capacity limit. However, the Board ruled that only hazardous waste placed in the landfill prior to

5. An acre-foot equals an area one foot deep over one acre of land. A 2250 acre-foot area equals approximately 3.6 million cubic yards.

the Board's order counted towards the 2250 acre-foot capacity limit.

The DHEC Board found the stipulated agreement's financial assurance provisions reasonable except for the amounts required for cleanup costs and environmental restoration. Therefore, the Board modified the final permit to require an environmental impairment fund consisting of two parts: (1) a $133,000,000 cash trust fund beginning with a $30,000,000 initial contribution followed by additional contributions in amounts sufficient to ensure the fund reached $133,000,000 by the year 2000 and (2) a corporate guarantee from Laidlaw's Canadian parent corporation until the cash fund reached full funding. The Board noted a corporate guarantee is prudent only as a short term measure until cash funding is promptly accumulated.

Finally, the DHEC Board deemed the Pinewood Facility an "existing unit" and thus permitted Laidlaw 180 days after the final permit's effective date to demonstrate compliance with location standards.

Upon a motion for reconsideration, the DHEC Board modified its original decision regarding financial assurances and permitted Laidlaw to delay fulfilling the cash fund until 2004, rather than 2000, as previously ordered. The Board reaffirmed its distrust of corporate guarantees stating "a corporate guarantee is not found to be a prudent mechanism for a short term or long term coverage of financial risk."

Laidlaw sought judicial review contending the DHEC Board erred in its decisions regarding capacity and financial assurances requirements. Sierra Club also petitioned for judicial review asserting the Board misapplied the burden of proof, improperly accepted the stipulated agreement, and erred in decisions concerning capacity, location standards, and financial responsibility determinations.

While the parties' appeals were pending, DHEC issued notice of its proposal to modify and revise the hazardous waste regulations. Approximately six months later, the DHEC Board approved the regulations. The regulations require a hazardous waste facility operator to establish financial assurance for cleanup and restoration of environmental impairment costs. 25 S.C.Code Ann. Regs. 61–79.264.153 (Supp.1998).

Under the regulations, the operator must choose a financial assurance mechanism from among several options including, a trust fund for environmental impairment, cleanup and environmental restoration insurance, or a corporate guarantee coupled with a financial test of the operator. *Id.* After the operator's selection, DHEC consults with the State Treasurer and determines whether the mechanism chosen by the operator provides adequate financial assurance and meets the requirements set forth in the regulations. *Id.*

Laidlaw submitted a financial assurance election, choosing the corporate guarantee option, and DHEC accepted the choice pending judicial resolution of Laidlaw's financial assurance issues.[6]

Thereafter, Sierra Club supplemented its circuit court pleadings contending DHEC's financial assurance regulations were invalid because they permitted the regulated entity, rather than DHEC, to choose the form of financial assurance, the regulations were not reasonably related to the enabling statute, DHEC improperly accepted a corporate guarantee as a cash fund substitute, the new regulations arbitrarily capped the potential financial assurance amount at $135,000,000, and DHEC violated the Administrative Procedures Act in promulgating the regulations. Sierra Club further argued that even if the regulations were valid, the regulations did not apply to Laidlaw because DHEC promulgated the regulations after issuing Laidlaw's final permit and the regulations failed to protect the public health and environment.

The circuit judge concluded substantial evidence supported the DHEC Board's decision to grant Laidlaw the final permit as modified and count both hazardous and nonhazardous waste towards the final permit's 2250 acre-foot capacity limit. The circuit judge held DHEC properly promulgated the financial assurance regulations and the financial assurance regulations applied to Laidlaw.

Sierra Club appeals, contending first, that the stipulated agreement violates the South Carolina Administrative Procedures Act (APA), DHEC's own procedures, and is contrary to

---

**6.** At oral argument, Laidlaw's counsel asserted that Laidlaw has now chosen the insurance option for meeting its financial assurance responsibilities.

the substantial evidence in the whole record. Second, if the issuance of the permit is upheld, Sierra Club contends certain provisions in the permit are contrary to the reliable, probative, and substantial evidence on the whole record. Third, Sierra Club contends DHEC improperly promulgated and applied the financial assurance regulations. Laidlaw also appeals, contending the DHEC Board erred in counting both nonhazardous and hazardous waste toward the final permit's capacity limit.

## STANDARD OF REVIEW

Under the APA, "[t]his court will not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact." *Ballenger v. South Carolina Dep't of Health and Envtl. Control,* 331 S.C. 247, 251, 500 S.E.2d 183, 185 (Ct.App.1998); S.C.Code Ann. § 1–23–380 (Supp.1998). We will not overrule an agency's decision unless:

substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions or decisions are:

(a) in violation of constitutional or statutory provisions;

(b) in excess of the statutory authority of the agency;

(c) made upon unlawful procedure;

(d) affected by other error of law;

(e) clearly erroneous in view of the reliable, probative and substantial evidence on the whole record; or

(f) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

S.C.Code Ann. § 1–23–380(A)(6) (Supp.1998); *Ballenger,* 331 S.C. at 251, 500 S.E.2d at 185.

"Substantial evidence is not a mere scintilla of evidence nor evidence viewed blindly from one side, but is evidence which, when considering the record as a whole, would allow reasonable minds to reach the conclusion that the agency reached...." *Welch Moving and Storage Co., Inc. v. Pub. Serv. Comm'n of South Carolina,* 301 S.C. 259, 261, 391 S.E.2d 556, 557 (1990) (quoting *Palmetto Alliance, Inc. v. South Carolina Public Serv. Comm'n,* 282 S.C. 430, 432, 319 S.E.2d 695, 696 (1984)). "The 'possibility of drawing two inconsistent

conclusions from the evidence does not prevent an Administrative Agency's finding from being supported by substantial evidence.'" *Grant v. South Carolina Coastal Council*, 319 S.C. 348, 353, 461 S.E.2d 388, 391 (1995) (quoting *Palmetto Alliance, Inc.*, 282 S.C. at 432, 319 S.E.2d at 696).

## LAW/ANALYSIS

### I. Whether DHEC Violated Sierra Club's Procedural Due Process Rights by Entering into the Stipulated Agreement with Laidlaw?

▇ Sierra Club contends DHEC violated its due process rights by entering into an *ex parte* stipulated agreement with Laidlaw. Specifically, Sierra Club contends the stipulated agreement circumvented the regulatory procedures for permit issuance and review, thus improperly absolving Laidlaw's burden of proof and violating Sierra Club's procedural due process rights.[7] While we expressly disapprove of the *ex parte* procedure utilized by DHEC and Laidlaw which culminated in the stipulated agreement, we hold the exhaustive hearing and the DHEC Board's review removed any prejudicial error and adequately protected Sierra Club's due process rights.

▇ "Due process is flexible and calls for such procedural protections as the particular situation demands." *Ogburn–Matthews v. Loblolly Partners*, 332 S.C. 551, 561, 505 S.E.2d 598, 603 (Ct.App.1998) (quoting *Stono River Envtl. Protection Ass'n v. South Carolina Dep't of Health and Envtl. Control*, 305 S.C. 90, 94, 406 S.E.2d 340, 341 (1991)). "The requirements of due process include notice, an opportunity to be heard in a meaningful way, and judicial review." *Ogburn–Matthews*, 332 S.C. at 562, 505 S.E.2d at 603; *see also* S.C. Const. art. 1, § 22. "To prove the denial of due process in an

---

7. This analysis assumes, without deciding, Sierra Club invoked a fundamental right warranting procedural due process protections. *See Ogburn–Matthews v. Loblolly Partners*, 332 S.C. 551, 562, 505 S.E.2d 598, 603 (Ct.App.1998) ("Due process encompasses all rights which are of such fundamental importance as to require compliance with due process standards of fairness and justice and includes procedural ... rights of citizens against government actions that threaten the denial of life, liberty, or property." (quoting *Anonymous v. State Bd. of Med. Exam'rs*, 323 S.C. 260, 264, 473 S.E.2d 870, 872 (Ct.App.1996), *rev'd on other grounds*, 329 S.C. 371, 496 S.E.2d 17 (1998))).

administrative proceeding, a party must show that it was substantially prejudiced by the administrative process." *Ogburn–Matthews,* 332 S.C. at 561, 505 S.E.2d at 603 (citing *Palmetto Alliance, Inc. v. South Carolina Public Service Comm'n,* 282 S.C. 430, 319 S.E.2d 695 (1984)).

The regulations in effect during the permitting process outlined the burden of proof pertinent to an administrative hearing.[8] Regulation 61–72 section XVI stated the moving or complaining party "shall" present his evidence or testimony first, followed by all other parties. 25 S.C.Code Ann. Regs. 61–72 § XVI(C) (1989).[9] This implies the complaining party bears the burden of proof. *See Hoffman v. County of Greenville,* 242 S.C. 34, 39, 129 S.E.2d 757, 760 (1963) ("The burden of proof is upon the party who by the pleadings has the affirmative on the issue. One who pleads an affirmative

---

**8.** Our analysis focuses on whether DHEC followed the regulatory procedures in effect during the permit review process. We therefore apply the regulations effective during the actual permit review and need not consider whether subsequent amendments apply prospectively or retroactively. *See Rehkopf v. Kuhland,* 30 S.C. 234, 238, 9 S.E. 99, 101 (1889) (holding a statutory amendment inapplicable to a cause of action that accrued prior to the amendment and applying the statute in effect when the action accrued); *Compare* David E. Shipley, *South Carolina Administrative Law* 4–50 (1983) (noting regulations normally apply prospectively), *with Carolina Power & Light Co. v. Town of Pageland,* 321 S.C. 538, 543, 471 S.E.2d 137, 140 (1996) ("The cardinal rule in determining whether a statute will have prospective or retroactive application is that the intent of the legislature controls."), *and American Nat'l Fire Ins. Co. v. Smith Grading and Paving, Inc.,* 317 S.C. 445, 448, 454 S.E.2d 897, 899 (1995) ("A statute is not to be applied retroactively unless that result is so clearly compelled as to leave no room for doubt. The statute must contain express words evincing an intent that it be retroactive or words necessarily implying such an intent. The only exception to this rule is a statutory enactment that effects a change in remedy or procedure." (internal citations omitted)), *and Snavely v. Perpetual Fed. Sav. Bank,* 306 S.C. 348, 350, 412 S.E.2d 382, 384 (1991) (noting the presumption that statutory enactments apply prospectively rather than retroactively in their operation unless there is a specific provision of clear legislative intent to the contrary).

**9.** The revised provision states: "The moving party shall bear the burden of proof to establish the matters propounded by a preponderance of the evidence; provided, however, that in appeals of orders assessing civil penalties or imposing sanctions, the Department shall have the burden of proof as to the allegations contained therein." 25 S.C.Code Ann. Regs. 61–72 Part VII § 702(B) (Supp.1998).

defense has the burden of proving it." (internal citations omitted)); 2 Am.Jur.2d *Administrative Law* § 360 (1994) ("Generally, the burden of proof is on the party asserting the affirmative issue in an adjudicatory administrative proceeding."); 73A C.J.S. *Public Administrative Law and Procedure* § 128 at 35 (1983) ("In administrative proceedings, the general rule is that an applicant for relief, benefits, or a privilege has the burden of proof, and the burden of proof rests upon one who files a claim with an administrative agency to establish that required conditions of eligibility have been met. It is also a fundamental principle of administrative proceedings that the burden of proof is on the proponent of a rule or order, or on the party asserting the affirmative of an issue.").

Both Laidlaw and Sierra Club petitioned for review and thus both bore a burden of proof. *See Rice v. South Carolina Dep't of Highways and Pub. Transp.*, 277 S.C. 495, 496–7, 289 S.E.2d 645, 646 (1982) (holding litigants shared the burden of proof where the landowner had the burden of proving his damages from a taking and the agency had the burden of proving benefits received by the landowner). Thus, Laidlaw bore the burden of proving DHEC erred by imposing certain conditions in the final permit; Sierra Club bore the burden of establishing DHEC erred in issuing the final permit and financial responsibility determinations.

Laidlaw and DHEC resolved their disagreements as set forth in the stipulated agreement. The APA provisions permit parties to resolve disputes through informal stipulations. 25 S.C.Code Ann. Reg. 61–72 § XIII (1989) ("Contested cases may be resolved by informal disposition through means of stipulation, agreed settlement, consent order (with or without financial penalty) or default."); S.C.Code Ann. § 1–23–320(f) (1986) ("Unless precluded by law, informal disposition may be made of any contested case by stipulation, agreed settlement, consent order or default."). Consequently, Laidlaw no longer sought a hearing once its issues were resolved and therefore withdrew as a complaining party by amending its revised pleadings to reflect how the stipulated agreement resolved its contentions.

Sierra Club, however, maintained its objections, thus retaining its burden of proving DHEC's decision to issue the final

permit and financial responsibility determination was contrary to the reliable, probative, and substantial evidence on the whole record. Laidlaw's agreement with DHEC did not affect Sierra Club's independently existing duty. Furthermore, at the hearing's conclusion, the hearing examiner ostensibly based his recommendation on the preponderance of the evidence, rather than on any one party's burden of proof, thereby refuting Sierra Club's contention the stipulated agreement altered the burden of proof. Therefore, the stipulated agreement did not improperly absolve or shift Laidlaw's burden of proof.

Sierra Club further contends DHEC's permit issuance should be reversed because the permit's terms were based on the stipulated agreement which was negotiated without affording an opportunity to participate to Sierra Club, a named party in the litigation. Although we disapprove of DHEC's procedure, we affirm the permit issuance because Sierra Club failed to establish substantial prejudice in light of the extensive administrative hearing and the DHEC Board's review.

Both Laidlaw and DHEC presented witnesses at the administrative hearing which lasted approximately twenty-four days. Sierra Club participated in the lengthy hearing by presenting its own witnesses and cross-examining Laidlaw's and DHEC's witnesses. Therefore, even if the stipulated agreement violated regulatory procedure, Sierra Club cannot establish substantial prejudice because it was afforded a full opportunity to present its case before the hearing examiner.

Moreover, the DHEC Board objectively reviewed the hearing commissioner's decision to uphold the permit issuance as modified by the stipulated agreement. At oral argument, Sierra Club's counsel conceded the DHEC Board corrected two of Sierra Club's three most egregious concerns. First, the Board altered the permit so that both hazardous and nonhazardous waste counted toward the Pinewood Facility's capacity limit. Second, the Board required an environmental impairment cash trust fund of $133,000,000 to be funded by 2004.

The DHEC Board's reversal of two of Sierra Club's three major contentions discredits Sierra Club's contention that the stipulated agreement tainted the entire process. We there-

fore conclude Sierra Club failed to establish the stipulated agreement substantially prejudiced its due process rights. *See Ogburn–Matthews,* 332 S.C. at 561, 505 S.E.2d at 603 (stating a party must show it was substantially prejudiced by the administrative process to establish a denial of due process).

We further note that while the pertinent regulations authorize the resolution of disputes through stipulated agreements, the regulations do not explicitly authorize stipulated agreements at the exclusion of a named party. Furthermore, the regulations also provide explicit and elaborate mechanisms for modifying or challenging permit conditions. *See* 25 S.C.Code Ann. Regs. 61–79.124.5 (1989) (outlining procedures for modifying permits); 25 S.C.Code Ann. Regs. 61–79.270.41 (1989) (listing grounds for major modifications including material facility alterations, new information, and new regulations etc.); 25 S.C.Code Ann. 61–79.270.42 (1989) (outlining procedures for minor modifications); 25 S.C.Code Ann. Regs. 61–72 § III (1989) (outlining procedures for adjudicatory hearings).

Although DHEC issued the final permit to Laidlaw after completing the procedures required for permit issuance, including issuing a draft permit, giving public notice, affording an opportunity for public comment, and preparing responses to oral and written comments received, DHEC then effectively circumvented the permitting procedures by modifying the final permit through *ex parte* negotiations with Laidlaw. DHEC's *ex parte* agreement with Laidlaw negatively impacted Sierra Club's due process rights, undermined the spirit of the APA whose statutory framework is designed to ensure notice to and participation by all interested parties, and called into question the fairness of the permitting procedures. Consequently, we limit our holding to the facts of this case because absent the exhaustive twenty-four day hearing and meaningful review by the DHEC Board, which Sierra Club concedes cured two of Sierra Club's three major concerns, DHEC's and Laidlaw's actions might well require reversal.

## II. Whether the Permit's Provisions are Clearly Erroneous in View of the Reliable, Probative and Substantial Evidence on the Whole Record?

Because we conclude Sierra Club failed to establish a due process violation warranting reversal, we now address wheth-

er the reliable, probative, and substantial evidence on the whole record supports particular provisions in the final permit.

 The DHEC Board is the ultimate fact finder and may make its own findings adverse to the hearing officer's. *See Sierra Club v. Kiawah Resort Assocs.,* 318 S.C. 119, 125, 456 S.E.2d 397, 400 (1995) (noting the full Coastal Council is the ultimate finder of fact and may make its own findings adverse to those of the hearing officer). The DHEC Board's findings are presumptively correct and therefore the challenging party bears the burden of proving the DHEC Board's order is clearly erroneous in view of the substantial evidence on the whole record. *See Patton v. South Carolina Pub. Serv. Comm'n,* 280 S.C. 288, 290–1, 312 S.E.2d 257, 259 (1984) (explaining the burden of proof rests on the party challenging the Public Service Commission's order).

### A. Location Standards

 Sierra Club contends the DHEC Board erred in deeming the Pinewood Facility an "existing unit" and then allowing Laidlaw to establish compliance with the location standards 180 days after the final permit became effective, rather than requiring evidence of compliance with location standards as a prerequisite to permit issuance.

S.C.Code Ann. section 44–56–35 authorizes DHEC to promulgate regulations establishing location standards for hazardous waste disposal facilities to "ensure long-term protection of human health and the environment." S.C.Code Ann. § 44–56–35 (Supp.1998). The statute provides: "Upon promulgation of these standards, any *new* facility shall comply with these standards prior to issuance of a Part B permit. For any *existing* facility, these new standards shall be incorporated and become a condition of any Part B permit. Failure to meet the site suitability standard regulations shall be deemed to be a failure to meet the conditions of the permit." *Id.* (emphasis added); *see also* 25 S.C.Code Ann. Regs. 61–79.270.30(a) (Supp.1998) ("Any permit noncompliance . . . constitutes a violation of the appropriate Act and is grounds for enforcement action; for permit termination, revocation and reissuance, or modification; or for denial of a permit renewal application."); 25 S.C.Code Ann. 61–79.270.43 (Supp.1998)

(noting that a permittee's noncompliance with a condition of the permit is grounds for terminating the permit).

The corresponding regulation states: "For units permitted prior to the effective date of this regulation, failure to submit a demonstration of compliance with these location standards within one hundred and eighty days of the effective date of this regulation shall be deemed to be a failure to meet the conditions of the permit." 25A S.C.Code Ann. Regs. 61–104 § II(A) (1998). The regulation defines existing unit as "a unit which has received a hazardous waste permit by the effective date of this regulation *or* has met the requirements for interim status." 25A S.C.Code Ann. Regs. 61–104 III(K) (Supp.1998) (emphasis added).

Laidlaw qualified for interim status in 1980. In July 1989, DHEC issued Laidlaw a final permit effective September 1, 1989. The location standard regulations did not become effective until February 22, 1991. *See* 25A S.C.Code Ann. Regs. 61–104 (Supp.1998). Therefore, DHEC properly deemed Laidlaw an existing unit. 25A S.C.Code Ann. Regs. 61–104 § III(K) (Supp.1998).

The regulations then required Laidlaw to establish compliance with the location standards within 180 days of the regulation's effective date, February 22, 1991. 25A S.C.Code Ann. Regs. 61–104 § II(A) (Supp.1998). Whether Laidlaw established compliance within the 180 day period is moot since Laidlaw has now satisfied the location standards.[10] *See Byrd v. Irmo High Sch.*, 321 S.C. 426, 431, 468 S.E.2d 861, 864 (1996) ("A case becomes moot when judgment, if rendered,

---

10. The only evidence in the record Laidlaw complied with the location standards is the circuit judge's assertion to that effect. Although Sierra Club contends in a footnote that the circuit judge erred in relying on statements made by DHEC's or Laidlaw's counsel that Laidlaw complied with the locations standards, Sierra Club did not sufficiently argue the issue to preserve it for appeal. *See First Sav. Bank v. McLean*, 314 S.C. 361, 363, 444 S.E.2d 513, 514 (1994) (noting an issue which is not argued in the brief is deemed abandoned and precludes consideration on appeal), *cited in Taylor v. Medenica*, 331 S.C. 575, 582 n. 7, 503 S.E.2d 458, 462 n. 7 (1998); *see also Muir v. C.R. Bard, Inc.*, 336 S.C. 266, 519 S.E.2d 583 (Ct.App.1999) (noting that conclusory arguments may be treated as abandoned); Rule 208(b)(1)(B), SCACR ("Ordinarily, no point will be considered which is not set forth in the statement of the issues on appeal." (formerly Rule 207(b)(1)(B), SCACR)).

will have no practical legal effect upon existing controversy." (quoting *Mathis v. South Carolina State Highway Dep't*, 260 S.C. 344, 346, 195 S.E.2d 713, 715 (1973))). Therefore, we reject Sierra Club's contention that it was error to deem the Pinewood Facility an existing unit and allow Laidlaw 180 days to establish compliance.

**B. "Claims Made" Accidental Occurrences Insurance Policy**

 Sierra Club next contends DHEC's financial responsibility decision is clearly erroneous because DHEC accepted a "claims made" insurance policy for accidental occurrence liability coverage in an insufficient amount.

S.C.Code Ann. section 44–56–60(c) (1985) provides: "Before issuance of a permit, the Department shall require ... [e]vidence of liability insurance for sudden and nonsudden accidental occurrences in such amount as the Department may determine necessary for the protection of the public health and safety of the environment." S.C.Code Ann. § 44–56–60(c) (1985). Our legislature deemed the liability coverage necessary, in part, "[t]o protect future generations from the financial devastation of disrupted hazardous waste burial sites and accidents involving hazardous materials by increasing the amount of the Hazardous Waste Contingency Fund by industry and state contributions." S.C.Code Ann. § 44–56–60 (Supp.1998) (editor's note).

Regulation 61–79.264.147 requires a minimum coverage amount of one million dollars per occurrence with an annual two million dollar aggregate for sudden occurrences, and three million dollars per occurrence and a six million dollar annual aggregate for non-sudden accidental occurrences. 25 S.C.Code Ann. Regs. 61–79.264.147(a) & (b) (1989).[11]

Laidlaw's thirty million dollar policy substantially exceeds the minimum regulatory requirements. *See* 25 S.C.Code Ann. Regs. 61–79.264.147(a) & (b) (1989). Furthermore, in 1989, Peat Marwick conducted an independent financial responsibility assessment of the Pinewood Facility and reviewed an insurance policy covering it which was also a claims made

---

11. These regulations were not altered by the amendments to the financial assurance regulations discussed in section III.

policy. Peat Marwick concluded the policy's terms and conditions comported with industry standards. Lastly, the thirty million dollar policy remains the industry standard for third party liability coverage and it is unlikely any further coverage is even attainable. Therefore, we affirm the DHEC Board's decision approving the thirty million dollar claims made policy.

## C. Potential Leaks and Harm to Lake Marion

 Finally, Sierra Club contends the DHEC Board's factual findings regarding leaks from the Pinewood Facility and potential harm to Lake Marion are unsupported by the record and clearly erroneous in view of the reliable, probative, and substantial evidence. We disagree.

The record contains testimony that there have been no significant findings of contamination caused by tears in the landfill's lining. Testimony also established that the Pinewood Facility does not have a high potential for a release and that no release had exhibited itself at the time of the hearing. Moreover, it appears the landfill's design exceeded the regulatory requirements at each stage of construction. Testimony also established that the monitoring system exceeded the regulatory requirements and will prevent contamination by detecting a release in time to correct the problem before damage occurs. Finally, there is testimony from several experts stating that even if an undetected and unremediated leak occurred, there would be no practical impact on Lake Marion because of slow migration and dilution. Therefore, although we have concerns about the proximity of this facility to Lake Marion, we conclude the record contains substantial evidence sufficient to affirm the DHEC Board's factual conclusions regarding potential leaks and harm to Lake Marion. *See Ballenger*, 331 S.C. at 251, 500 S.E.2d at 185 (noting "this court will not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact" and an agency's factual finding may only be reversed if clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record); *see also* S.C.Code Ann. § 1–23–380(A)(6) (Supp.1998). We therefore affirm DHEC's permit issuance.[12]

---

12. Sierra Club also argued the DHEC Board acted arbitrarily, capriciously, and contrary to the substantial evidence by excluding from the

### III. Whether DHEC Violated the APA in Promulgating the Financial Assurance Regulations?

Sierra Club contends DHEC failed to promulgate the financial assurance regulations in compliance with the APA. Specifically, Sierra Club contends DHEC failed to issue proper notice and provide opportunity for adequate public comment. We agree.

Before promulgating or amending a regulation, the APA requires DHEC to publicly notice a drafting period through publication in the State Register. S.C.Code Ann. § 1–23–110(A)(1) (Supp.1993). DHEC must also "give notice of a public hearing at which the agency will receive data, views, or arguments, orally and in writing, from interested persons on proposed regulations ... if requested by twenty-five persons ... or by an association having not less than twenty-five members." S.C.Code Ann. § 1–23–110(A)(3) (Supp.1993). The notice of a public hearing must include "either the text or a synopsis of the proposed regulation." S.C.Code Ann. § 1–23–110(A)(3)(c) (Supp.1993).

On June 24, 1994, DHEC publicly noticed its proposal to modify and revise hazardous waste regulations. The notice stated the provisions under consideration included: "[m]odify[ing] financial assurance provisions for cleanup and environmental impairment restoration at treatment, storage, and disposal facilities." Subsequently, DHEC received several written comments from industry.

DHEC issued a second notice on September 23, 1994. This second notice, and any notice of a drafting period subsequent to July 1, 1994, was required to include "a synopsis of what the agency plans to draft." S.C.Code Ann. § 1–23–110(A)(1)(b) (Supp.1993). The September notice omitted any reference to financial assurance provisions.

On October 13, 1994, DHEC published its proposed modifications summary for information purposes only. Although the summary referenced the June and September notices, the proposed modifications omitted any reference to, or synopsis

---

Pinewood Facility's capacity limit nonhazardous waste disposed prior to the DHEC Board's order. This contention is addressed in part IV of our discussion along with Laidlaw's capacity arguments.

of, financial assurance regulations. On October 28, 1994, DHEC published notice of a public hearing to be held December 8, 1994. While the notice referenced the June and September notices, the synopsis failed to include financial assurance provisions as a matter for consideration.

On November 28, 1994, DHEC held an informational forum and received public comments. The comments received from industry focused on the *absence* of financial assurance provisions and accused DHEC of abandoning regulations proposed through public review and comment procedures in favor of new regulations with little or no public notice or comment.

On December 8, 1994, a hearing was held before the DHEC Board where the DHEC staff issued its proposed regulations and sought final approval from the Board. The proposed regulations did not include any financial assurance provisions. At the Board meeting a DHEC staff member, as well as DHEC's Commissioner, stated the proposed regulations omitted provisions addressing financial assurances for environmental impairment. The Commissioner noted, however, that DHEC had received comments from the regulated community and intended to propose financial assurance regulations at the next DHEC Board meeting. After the DHEC Board meeting, industry opponents began voicing their concern over DHEC's potential amendments.

On January 12, 1995, DHEC submitted financial assurance regulations to the DHEC Board without any additional notice of drafting or opportunity for public comment. This was the first notice to the public of the content of the proposed regulations. DHEC stated the new regulations resulted from comments received from the June and September notices, the November information forum, and the December 8, 1994 DHEC Board meeting. The DHEC Board gave those opposing or supporting the new regulations three minutes each to speak. The DHEC Board then approved the regulations with one alteration. The Board changed the phrase "the state treasurer shall determine if the mechanism chosen meets the requirements set forth" to "[t]he department, after consultation with the state treasurer, shall determine if the mechanism chosen meets the requirements set forth."

We find DHEC's promulgation procedure insufficient to satisfy the letter or the spirit of the APA. Although the June 1994 notice mentioned modifying financial assurance provisions, the September 1994 notice omitted any such reference. Even if the September notice was independent from the June notice, as Laidlaw argues,[13] the October notice of the December public hearing, which explicitly referenced the June and September notices, omitted any reference to proposed changes in the financial assurance regulations. By explicitly referencing the June notice and failing to include modification of financial assurance provisions as a topic for consideration at the public hearing, DHEC essentially put Sierra Club, and the public in general, on notice that it had decided against pursuing modification of the financial assurance provisions as originally indicated in the June notice.

Moreover, DHEC's response to comments explicitly stated the regulations proposed in December omitted financial assurance provisions. Furthermore, both a DHEC staff member and the DHEC Commissioner stated the regulations proposed in December failed to address financial assurance issues. Therefore, DHEC itself confirms Sierra Club's argument that the preceding process did not address financial assurance issues nor provide notice that DHEC was still considering modifying the financial assurance regulations.

At the December 8, 1994 DHEC Board meeting, DHEC mentioned its intentions to propose financial assurance regulations. However, no further public notice, draft, or hearing was issued or held regarding the financial assurance provisions. As indicated above, the October notice of the December public hearing essentially put Sierra Club on notice that DHEC had abandoned its intention of modifying the financial

---

**13.** Laidlaw contends this second notice was separate and independent from the June notice and therefore any omission of financial assurance considerations was immaterial. However, Laidlaw and DHEC expressly listed the September notice as part of the chronology of events involved in the promulgation of the financial assurance regulations. Furthermore, the omission in the September notice of any reference or synopsis of the financial assurance regulations is significant, not because it is or is not related to the June notice, but because it provides another indication of a missed opportunity for DHEC to issue sufficient notice of the proposed regulations before the January DHEC Board meeting.

assurance regulations. Therefore, DHEC was required to publish new notice of its intention to modify the financial assurance regulations. *See* S.C.Code Ann. § 1–23–110(A)(1) (Supp.1993 and 1999).

Even if republication of notice was not required, DHEC's failure to properly notice the December 8, 1994 public hearing before the DHEC Board is fatal. DHEC stated the financial assurance regulations resulted, in part, from comments received at the hearing during the December DHEC Board meeting. However, there is no indication in the record that this public hearing before the DHEC Board was properly noticed with either the text or a synopsis of the proposed financial assurance regulations.[14] *See* S.C.Code Ann. § 1–23–110(A)(3)(c) (Supp.1993).

We reject Laidlaw's argument that a three minute opportunity to express concern cures procedural defects and waives the right to contest a deficient notice and comment procedure. Furthermore, the DHEC Board's decision to adopt the regulations at the same meeting Sierra Club was first afforded the opportunity to contest the regulations implies the DHEC Board's decision was already made and further taints the promulgation procedures. Finally, we decline to hold that the General Assembly's approval of the regulations' substantive content cures the defects in DHEC's promulgation of those regulations.

While DHEC may modify its proposed regulations based on comments received, the regulations subject to comment must be properly noticed to afford balanced participation and an adequate opportunity to submit comments. The proposed financial assurance regulations at issue are not mere modifications from previously issued regulations but constitute an entirely new set of regulations governing financial assurance.

14. We acknowledge that notice of a public hearing is generally only required when requested by 25 persons or an association having not less than twenty-five members. S.C.Code Ann. § 1–23–110(A)(3) (Supp. 1993). However, even if Sierra Club failed to request a public hearing, DHEC stated the regulations were promulgated in light of the hearing before the DHEC Board. Therefore, we hold DHEC was required to satisfy the notice requirements for a public hearing. *See* 1–23–110(A)(3)(c) (Supp.1993). Furthermore, DHEC's failure to provide adequate notice that the financial assurance regulations were still being considered excused Sierra Club from requesting a hearing.

We do not believe DHEC's authority to respond to comments amounts to a license to issue regulations without subjecting them to public notice and comment.

We hold DHEC violated the APA in promulgating the financial assurance regulations and therefore vacate the financial assurance regulations. Consequently, Laidlaw must immediately begin paying into the $133,000,000 environmental impairment cash trust fund and ensure the fund is fulfilled by 2004 as ordered by the DHEC Board. Because we reverse on procedural grounds, we do not reach Sierra Club's remaining contentions regarding the substance of the proposed financial assurance regulations.

**IV. Whether the Reliable, Probative and Substantial Evidence on the Whole Record Supports the DHEC Board's Ruling that both Hazardous and Nonhazardous Waste Count Towards the Final Permit's 2250 acre-foot Capacity Limit?**

Laidlaw contends the DHEC Board erred in counting both hazardous and nonhazardous waste towards the final permit's 2250 acre-foot capacity limit, asserting the DHEC Board (1) erroneously applied the hazardous waste regulatory provisions to nonhazardous waste, (2) unlawfully revoked IWP–145, and (3) misinterpreted and misapplied the mixture rule.

**A.**

Laidlaw first contends the regulations governing the final permit only apply to hazardous waste and thus the DHEC Board erred in applying nonhazardous waste, allegedly regulated under IWP–145, towards the final permit's 2250 acre-foot capacity limit. We disagree.

The statutory and regulatory language may indicate, at least facially, that the provisions only govern hazardous waste disposal. *See, e.g.,* S.C.Code Ann. § 44–56–60(a)(2) (Supp. 1998) ("No person may ... operate any *hazardous* waste treatment, storage, or disposal facility or site ...." (emphasis added)); 25 S.C.Code Ann. Regs. 61–79.270.13(i) (Supp.1998) ("Part A of the application shall include ... [a] description of the processes to be used for treating ... *hazardous* waste ....."). Upon closer inspection, however, we find the perti-

nent statutes and regulations govern hazardous waste facilities, not just hazardous waste. Therefore, we must determine whether the regulations govern the Pinewood Facility as a whole, including waste disposed under the pre-existing IWP–145.

When Laidlaw first received IWP–145, DHEC stated that, "if operation of the *facility* is impacted by any State or Federal laws or regulations then in effect, the Permit application must be resubmitted to comply with such new laws or regulations, and operation of the *facility* will comply with any stipulations contained therein." The same letter referenced the "hazardous characteristics of the waste" disposed at the Pinewood Facility. These references imply IWP–145 applied to the entire Pinewood Facility and thus governed hazardous and nonhazardous waste disposal subject to future regulations.

A DHEC letter accompanying the extension of IWP–145 contained a similar reservation. The letter stated:

"As you know this Department is developing comprehensive hazardous waste management regulations. At such time these regulations become effective, *all facilities handling waste defined as hazardous will be subject to these regulations.* It is likely that many of the wastes handled at this *facility* will be defined as hazardous and the regulations may affect the operation of your *site.* You should be aware of these upcoming requirements in planning the future development of this *site.*"

DHEC thus explicitly subjected the Pinewood Facility in general, and IWP–145 in particular, to future regulations governing hazardous waste. Furthermore, as the letters to Laidlaw indicated, the regulatory provisions govern *facilities or sites* handling hazardous waste. *See* S.C.Code Ann. § 44–56–60(a)(2) (Supp.1998) ("[n]o person may construct, substantially alter or operate a hazardous waste treatment, storage, or disposal *facility or site* . . . without first obtaining a permit from the department for the *facility, site,* or activity." (emphasis added)); 25 S.C.Code Ann. Regs. 61–79.270.1(b) (Supp. 1998) ("Not later than 90 days after the promulgation or revision of regulations . . . owners or operators of hazardous waste treatment, storage, or disposal *facilities* may be required to file a notification of the activity . . . ." (emphasis

added)); 25 S.C.Code Ann. 61–79.270.2 (" 'Disposal facility' means a facility or part of a facility at which hazardous waste is intentionally placed into or on the land or water, and at which hazardous waste will remain after closure."); *see also North Carolina Dep't of Human Resources v. United States Dep't of Health and Human Serv.*, 999 F.2d 767, 770 (4th Cir.1993) (noting an agency's interpretation of its own regulation deserves considerable deference).

Moreover, Laidlaw itself once contended that IWP–145 had been rescinded. In a letter to DHEC, Laidlaw argued "that the substantial changes in the regulation of the management of hazardous wastes by [DHEC] and by the [EPA] have superseded the provisions of [IWP–145] and rendered [IWP–145] unnecessary and unenforceable."

Therefore, the DHEC Board appropriately applied the regulations to the Pinewood Facility as a whole and, implicitly, to IWP–145. Applying the regulations to the Pinewood Facility as a whole enabled the DHEC Board to properly count both hazardous and nonhazardous waste disposed at the Pinewood Facility towards the final permit's 2250 acre-foot capacity limit, the Pinewood Facility's capacity limit as initially applied for by Laidlaw in 1980.[15]

## B.

■■■ Laidlaw contends treating the Pinewood Facility as a whole and counting both hazardous and nonhazardous waste towards the final permit's 2250 acre-foot capacity limit effectively revoked Laidlaw's IWP–145 without due process. We disagree.

We recognize that the DHEC Board's decision effectively superseded IWP–145. However, Laidlaw cannot successfully assert a due process violation because Laidlaw knew at the outset that future regulations could supersede IWP–145 and even advocated discarding IWP–145 when Laidlaw thought to do so would benefit itself. Moreover, the DHEC staff's

---

**15.** Laidlaw's estoppel argument fails for similar reasons because even if DHEC's refusal to terminate IWP–145 kept the permit in effect, the regulations applied to the Pinewood Facility as a whole and therefore the DHEC Board's ruling applying both hazardous and nonhazardous waste toward the 2250 acre-foot capacity limit was appropriate.

rejection of Laidlaw's suggestion to discard IWP–145 is not controlling because the DHEC Board, not the DHEC staff, is the ultimate fact finder. *See South Carolina Baptist Hosp. v. South Carolina Dep't of Health and Envtl. Control,* 291 S.C. 267, 269–70, 353 S.E.2d 277, 278–9 (1987) (noting that under the State Hospital Construction and Franchising Act the preliminary decision regarding an application for a certificate of need is made by the DHEC staff but the DHEC Board is the entity responsible for making the final agency decision); *see also Sierra Club,* 318 S.C. at 125, 456 S.E.2d at 400 ("The full Council is the ultimate finder of fact and may make its own findings adverse to those of the hearing officer.").

As discussed above, from the date Laidlaw initially received IWP–145, DHEC subjected the Pinewood Facility and the corresponding permit to future statutes and regulations governing hazardous waste. Once such regulations became effective, Laidlaw complied by submitting an application under the new regulatory scheme. Therefore, Laidlaw's argument that DHEC revoked IWP–145 without due process is unavailing.

## C.

■■■ Laidlaw also challenges the DHEC Board's "mixture rule" interpretation which supports counting hazardous and nonhazardous waste towards the 2250 acre-foot capacity limit. The "mixture rule" essentially deems a solid nonhazardous waste hazardous when mixed with a listed hazardous waste, regardless of the proportion. 25 S.C.Code Ann. Regs. 61–79.261.3(a)(2)(iv) (1989).

Laidlaw relies on EPA interpretations and asserts the mixture rule applies only to generators and is thus inapplicable to Laidlaw, a storage facility operator. However, the EPA's interpretations are not dispositive because states may impose more stringent standards than those promulgated by the EPA. 42 U.S.C.A. § 6929 (1995) ("Nothing in this chapter shall be construed to prohibit any State or political subdivision thereof from imposing any requirements ... which are more stringent than those imposed by [regulations issued under this provision]."); *Blue Circle Cement, Inc. v. Board of County Commissioners,* 27 F.3d 1499, 1504–5 (10th Cir.1994); *Old Bridge Chemicals, Inc. v. New Jersey Dep't of Envtl. Protec-*

*tion,* 965 F.2d 1287, 1292, (3rd Cir.1992). Therefore, the DHEC Board may interpret the mixture rule in a more restrictive manner than the EPA.

Although the DHEC Board declined to base its decision solely on the mixture rule, the DHEC Board did find that the mixture rule applied to disposing hazardous and nonhazardous waste into the Pinewood Facility. Rather than limit the mixture rule to generators, the DHEC Board applied the rule to waste disposal where hazardous and nonhazardous waste mixed because excavating the waste required treating it as hazardous. We find the DHEC Board's analysis reasonable. *See North Carolina Dep't of Human Resources v. United States Dep't of Health and Human Serv.,* 999 F.2d 767, 770 (4th Cir.1993) (noting an agency's interpretation of its own regulation deserves considerable deference).

The record contains substantial evidence that the waste disposed in the Pinewood Facility, at least in the early cells, became mixed. Even though Laidlaw began separating waste by clay berms, Laidlaw's compliance history, the Pinewood Facility's hydrogeology, and leaks within the landfill cells may still cause mixing. Furthermore, the record contains sufficient evidence that excavating the Pinewood Facility's waste will require treating the waste as hazardous.

Moreover, the DHEC Board's ruling counting both hazardous and nonhazardous waste towards the capacity limit accords with and furthers the federal policy seeking to minimize land disposal. 42 U.S.C.A. § 6901(b)(7) (1995); *Chemical Mfrs. Ass'n v. United States Envtl. Protection Agency,* 919 F.2d 158, 163–5 (D.C.Cir.1990). Therefore, we find the DHEC Board's interpretation of the "mixture rule" reasonable, in accord with federal policy, and further justification for applying both hazardous and nonhazardous waste toward the 2250 acre-foot hazardous waste capacity limit, thereby effectively limiting the Pinewood Facility's total capacity to 2250 acre-feet.

 Although Sierra Club agrees both hazardous and nonhazardous waste should count towards the 2250 acre-foot capacity limit, Sierra Club contends the DHEC Board acted arbitrarily, capriciously, and contrary to the substantial evidence by excluding nonhazardous waste disposed prior to the

DHEC Board's order from counting towards the final permit's 2250 acre-foot capacity limit. We agree.

The DHEC Board limited the final permit's capacity to 2250 acre-feet and counted both hazardous and nonhazardous waste toward the capacity limit. As discussed above, the DHEC Board recognized the mixture rule supported its conclusion because all waste mixed with hazardous waste must be treated as hazardous when excavated. Nevertheless, the DHEC Board then inexplicably excluded all nonhazardous waste disposed prior to the Board's order from counting towards the capacity limit.

The DHEC Board merely cited confusion and uncertainty over past interpretations to justify its decision to exclude previously disposed nonhazardous waste from counting towards the capacity limit. However, excluding previously disposed nonhazardous waste is inconsistent with the DHEC Board's mixture rule rationale which it asserted previously in support of its ruling to count both future hazardous and nonhazardous waste towards the capacity limit. We find the reason cited by the Board insufficient and conclude the Board acted arbitrarily and contrary to the substantial evidence in excluding nonhazardous waste disposed prior to its order from counting toward the final permit's 2250 acre-foot capacity limit. *See Hamm v. Southern Bell Tel. and Tel. Co.*, 302 S.C. 132, 136, 394 S.E.2d 311, 313 (1990)(noting mere opinions unsupported by evidence are insufficient); *Deese v. South Carolina State Bd. of Dentistry*, 286 S.C. 182, 184–5, 332 S.E.2d 539, 541 (Ct.App.1985) (An agency's decision "is arbitrary if it is without a rational basis, is based alone on one's will and not upon any course of reasoning and exercise of judgment, is made at pleasure, without adequate determining principles, or is governed by no fixed rules or standards.").

## V. Conclusion

We find Sierra Club failed to establish substantial prejudice as a result of the *ex parte* agreement. Therefore, reversal of the permit issuance on the ground of a due process violation is not warranted. Accordingly, we affirm the provisions of the final permit except as to capacity. In that regard, we find the record supports the DHEC Board's decision to count both

hazardous and nonhazardous waste toward the Pinewood Facility's capacity limit but reverse the DHEC Board's conclusion that nonhazardous waste disposed prior to the Board's order will not count towards the capacity limit. Finally, we conclude DHEC violated the APA in promulgating the financial assurance regulations and therefore vacate the financial assurance regulations.

Pursuant to the above analysis, we

**AFFIRM IN PART, REVERSE IN PART, and VACATE IN PART.**

STILWELL and HOWARD, JJ., concur.