KITTREDGE, J.:
The South Carolina Department of Health and Environmental Control (DHEC) appeals the circuit court's order finding DHEC erred in imposing certain flow and load limits in permits issued to the Charleston Commissioners of Public Works and the North Charleston Sewer District (hereinafter "Respondents"). For the reasons discussed below, we affirm in part, reverse in part, vacate in part, and remand to the circuit court for the purpose of remanding to the DHEC Board.
I.
Respondents collect and treat wastewater for portions of Charleston and Berkeley counties. The treated wastewater, called effluent, is discharged into either the Cooper River or Charleston Harbor. This discharge is permitted, subject to National Pollutant Discharge Elimination System (NPDES) permits issued by DHEC. In February 2003, DHEC issued Respondents renewed NPDES permits. Respondents requested a contested case hearing to challenge various provisions of the renewed permits.
Respondents challenged the renewed permits in two respects. First, Respondents argued there was no factual or legal basis for DHEC to impose weekly and monthly volumetric effluent flow limits (flow limits) in the renewed permits. Second, Respondents argued there was no factual or legal basis for DHEC to impose ultimate oxygen demand (UOD) load limits in the renewed permits. The UOD load limits set forth in the renewed permits vary depending on the time of the year; the limits set for the months of November through February ("winter months") are approximately three times higher than *155 the limits set for the months of March through October.[1]
The UOD load limits were based upon a Total Maximum Daily Load (TMDL) established by DHEC.[2] The TMDL purports to implement regulation 61-68(D)(4)(a) of the South Carolina Code (Supp. 2005), a regulation known as the "0.1 Rule." The "0.1 Rule" prohibits the quality of surface water from being cumulatively lowered more than 0.1 mg/l for dissolved oxygen from point sources and other activities when natural conditions cause a depression of dissolved oxygen. S.C.Code Ann. Regs. 61-68(D)(4)(a) (Supp. 2005). Respondents argued DHEC has no authority to apply UOD load limits during a given month in which there is no evidence of a depression of dissolved oxygen in the Cooper River or Charleston Harbor system for that month. Specifically, Respondents challenged the imposition of lower UOD load limits during March, April, May, and October (the "shoulder months").[3] DHEC sought to justify the imposition of UOD load limits for the "shoulder months" on a predictive modeling analysis-a holistic approach that does not narrowly depend on the data for a specific month to warrant UOD load limits for that month.
The Administrative Law Judge (ALJ) affirmed the issuance of the permits subject to two modifications. First, the ALJ ordered DHEC to remove the flow limits. The ALJ found DHEC lacked the authority to impose flow limits in an NPDES permit, concluding neither the South Carolina Code nor DHEC regulations authorize imposition of flow limits. Further, the ALJ found that, under the facts of this case, flow limits were unnecessary to protect water quality.
Second, the ALJ ordered DHEC to remove the UOD load limits set for the "shoulder months." The ALJ adopted Respondents' view and held the "0.1 Rule" does not apply to the "shoulder months" because there is no evidence of a depression in dissolved oxygen levels attributable to a natural condition during these months. The ALJ thus concluded that the "0.1 Rule" is only applicable during months in which such a depression is exhibited. The ALJ determined the UOD load limits established for the "winter months" should also apply to the "shoulder months." The ALJ further found DHEC was not authorized to rely on the TMDL to set permit limits because the TMDL was not promulgated as a regulation.
DHEC appealed the ALJ's order to the DHEC Board (the Board). Citing the South Carolina Pollution Control Act (SCPCA), S.C.Code Ann. §§ 48-1-10 to -350 (1987 and Supp. 2005), and regulation 61-9 of the South Carolina Code (Supp. 2005), the Board first held DHEC has the "legal authority to require flow limits in NPDES permits." The Board, however, joined the ALJ in concluding effluent flow limits were not warranted on the facts presented in this case. Accordingly, the Board affirmed the removal of the flow limits.
The Board next held the ALJ erred in interpreting the "0.1 Rule" as a matter of law. The Board construed the statute and regulation as follows: "If a waterbody is found to be a `naturally dissolved oxygen waterbody' for some period during the year, the requirements of Code § 48-1-83 and related Regulation 61-68.D.4 apply." Thus, contrary to the ALJ's narrow interpretation that DHEC may only impose UOD load limits during the months a depression in dissolved oxygen levels is exhibited, the Board ruled the UOD load limits may be imposed any time during the year provided the "0.1 Rule" is triggered at some point in the year. Because DHEC did not appeal the ALJ's *156 finding that the TMDL was improperly relied on to establish UOD load limits, the Board remanded the permits to DHEC to establish UOD load limits without relying on the TMDL.[4]
Respondents appealed to the circuit court. Regarding the effluent flow limits (which had been ordered removed from the challenged permits), the circuit court proceeded to address the legal issue of whether DHEC has authority to impose effluent flow limits in NPDES permits. The circuit court ruled DHEC lacks any express authority, either in statute or regulation, to impose flow limits. The circuit court also held that "while the Board ordered the removal [sic] flow limits from the [Respondents'] permits, those limits have not been removed and the issue of the Board's authority to impose flow limits is justiciable nevertheless because it is capable of repetition."
The circuit court agreed with Respondents' legal claim that section 48-1-83 of the South Carolina Code (Supp.2005) and regulation 61-68(D)(4)(a)-regarding the "0.1 Rule"- were unambiguous. Although the statute and the regulation are silent as to when the "0.1 Rule" may be applied, the circuit court ruled the law only allows the imposition of UOD load limits for a particular month when dissolved oxygen levels in a waterbody fall below the standard for that month. As a result, the circuit court found the Board erred in remanding Respondents' permits to DHEC staff for the purpose of calculating UOD loads for the "shoulder months." The circuit court reversed the Board and reinstated the ALJ's order. This appeal followed.
II.
The ALJ presides over all hearings of contested DHEC permitting cases and, in such cases, serves as the finder of fact. See S.C.Code Ann. § 1-23-600(B) (Act No. 387, 2006 S.C. Acts 387, eff. July 1, 2006); see also Brown v. S.C. Dep't of Health & Envtl. Control, 348 S.C. 507, 520, 560 S.E.2d 410, 417 (2002). The Board, pursuant to section 1-23-610(D) of the South Carolina Code (2005), reviewed the ALJ's order.[5] On appeal of such a contested case, a reviewing tribunal "must affirm the ALJ if the findings are supported by substantial evidence, not based on the [reviewing tribunal's] own view of the evidence." Dorman v. S.C. Dep't of Health & Envtl. Control, 350 S.C. 159, 166, 565 S.E.2d 119, 123 (Ct.App.2002); § 1-23-610(D). The circuit court conducted the second appellate review under section 1-23-380(A)(6) of the South Carolina Code (2005).[6]
Our review of the circuit court, which constitutes the third appellate review, is also governed by section 1-23-380(A)(6). Accordingly, this court may reverse the ALJ's decision if substantial rights of the appellant have been prejudiced and the findings, inferences, conclusions or decisions (1) violate constitutional or statutory provisions, (2) exceed the statutory authority of the agency, (3) are based upon unlawful procedure, (4) are affected by other error of law, (5) are *157 clearly erroneous in light of the reliable, probative and substantial evidence on the entire record, or (6) are either arbitrary, capricious, or reflect abuse of discretion or the obvious unwarranted exercise of discretion. § 1-23-380(A)(6); Weaver v. S.C. Coastal Council, 309 S.C. 368, 374, 423 S.E.2d 340, 343 (1992).
Under our standard of review, we may not substitute our judgment for that of the ALJ as to the weight of the evidence on questions of fact unless the ALJ's findings are clearly erroneous in view of the reliable, probative and substantial evidence in the whole record. See Marlboro Park Hosp. v. S.C. Dep't of Health & Envtl. Control, 358 S.C. 573, 580, 595 S.E.2d 851, 855 (Ct.App.2004). Substantial evidence is not a mere scintilla of evidence, but evidence which, considering the record as a whole, would allow reasonable minds to reach the conclusion the agency reached. Leventis v. S.C. Dep't of Health & Envtl. Control, 340 S.C. 118, 130, 530 S.E.2d 643, 650 (Ct.App.2000).
III.
DHEC contends the circuit court erred in finding Respondents adequately preserved issues for appeal because Respondents' Petition for Judicial Review (petition) failed to properly raise the issues for consideration. We disagree. Having carefully reviewed the petition, we find it adequately apprised the circuit court of "the abuse or abuses allegedly committed below through a distinct and specific statement of the rulings complained of." Smith v. S.C. Dep't of Soc. Servs., 284 S.C. 469, 471, 327 S.E.2d 348, 349 (1985). Because the issues were sufficiently preserved in the appeal to the circuit court, we now turn to the merits.
IV.
DHEC alleges the circuit court erred in rejecting the Board's interpretation of the "0.1 Rule" and finding the rule may only be applied during the months in which a natural depression in dissolved oxygen levels is demonstrated. DHEC argues the regulation is ambiguous and, therefore, the Board's interpretation is entitled to deference. We agree.
Generally, "the construction of a statute by the agency charged with its administration will be accorded the most respectful consideration and will not be overruled absent compelling reasons." Brown v. S.C. Dep't of Health & Envtl. Control, 348 S.C. 507, 515, 560 S.E.2d 410, 414 (2002) (quoting Dunton v. S.C. Bd. of Exam'rs in Optometry, 291 S.C. 221, 223, 353 S.E.2d 132, 133 (1987)). Indeed, the courts will typically defer to agency interpretation. Id. at 515, 560 S.E.2d at 415.
We note, however, "[t]he primary rule of statutory construction is that the Court must ascertain the intention of the legislature." Cooper v. Moore, 351 S.C. 207, 212, 569 S.E.2d 330, 332 (2002). Moreover, where the terms of the statute are clear, the court must apply those terms according to their literal meaning, without resort to subtle or forced construction to limit or expand the statute's operation. Moody v. Dairyland Ins. Co., 354 S.C. 28, 30-31, 579 S.E.2d 527, 529 (Ct.App.2003). Thus, the court will reject the agency's interpretation where it is specifically contrary to the statute or regulation. Brown, 348 S.C. at 515, 560 S.E.2d at 415.
Section 48-1-83(A) of the South Carolina Code (Supp.2005), the controlling statute of the "0.1 Rule," provides:
[DHEC] shall not allow a depression in dissolved oxygen concentration greater than 0.10 mg/l in a naturally low dissolved oxygen waterbody unless the requirements of this section are all satisfied by demonstrating that resident aquatic species shall not be adversely affected. The provisions of this section apply in addition to any standards for a dissolved oxygen depression in a naturally low dissolved oxygen waterbody promulgated by [DHEC] by regulation.
Regulation 61-68(D)(4) of the South Carolina Code (Supp. 2005), drafted pursuant to the authority granted by the SCPCA, provides:
Certain natural conditions may cause a depression of dissolved oxygen in surface waters while existing and classified uses are still maintained. The Department shall allow a dissolved oxygen depression *158 in these naturally low dissolved oxygen waterbodies as prescribed below pursuant to the Act, Section 48-1-83, et seq., 1976 Code of Laws:
a. Under these conditions the quality of the surface waters shall not be cumulatively lowered more than 0.1 mg/l for dissolved oxygen from point sources and other activities. . . .
We find the statute and regulation are ambiguous as to when the "0.1 Rule" applies. Clearly, the regulation requires the quality of the surface waters "not be cumulatively lowered more than 0.1 mg/l for dissolved oxygen from point sources or other activities" when "[c]ertain natural conditions . . . cause a depression of dissolved oxygen. . . ." Id. The regulation is silent, however, as to the timing of the limitations' application and allows for multiple interpretations. DHEC asserts, for example, that the "0.1 Rule" may be applied year-round whenever natural conditions cause a depression of dissolved oxygen in a waterbody at some point during the year.
There is support for DHEC's position in the record before us. Larry Turner, manager of the Water Quality Modeling section for DHEC, testified that DHEC developed loadings that are protective and conservative. He explained that during the four winter months (not at issue), DHEC determined less restrictive limits are required based on a number of factors including the cold weather and the increased ability of the system to absorb a pollutant without violating the standard during that period of the year. For the remainder of the year, DHEC applied the "0.1 Rule" as a protective measure given that the four summer months have a clearly demonstrated need for the "0.1 Rule."
We appreciate Respondents' desire that we find the statute and regulation mandate a monthly justification for the imposition of UOD load limits for a given month. There is, however, no language in the statute or regulation that suggests DHEC is confined to a narrow examination of a particular month's testing results to justify the application of the "0.1 Rule" for that month.
We find the statute is ambiguous and, therefore, defer to the Board's interpretation. See S.C. Coastal Conservation League v. S.C. Dep't of Health Envtl. Control, 363 S.C. 67, 75, 610 S.E.2d 482, 486 (2005) ("Courts defer to the relevant administrative agency's decisions with respect to its own regulations unless there is a compelling reason to differ."); see also Dunton v. S.C. Bd. of Exam'rs in Optometry, 291 S.C. 221, 223, 353 S.E.2d 132, 133 (1987) ("The construction of a statute by the agency charged with its administration will be accorded the most respectful consideration and will not be overruled absent compelling reasons.").
We find no compelling reasons to overrule the Board's interpretation as it is neither arbitrary nor capricious, and does not constitute an abuse of discretion. Further, Larry Turner's testimony provides a sound basis for why DHEC would take a holistic approach (and not a myopic month-to-month analysis) in evaluating when reasonable UOD load limits in a naturally dissolved oxygen waterbody are warranted. Admittedly, UOD load limits are issued in monthly intervals, but the decision whether to impose UOD load limits in a given month is not restricted to testing data for that month.
We find the Board's interpretation of the "0.1 Rule"-the statute and regulation it is charged with enforcing-is reasonable and in line with its overall statutory mandate. We hold the circuit court erred in reversing the Board and adopt the Board's finding that when natural conditions cause a depression of dissolved oxygen in a waterbody at some point during the year the "0.1 Rule" may be applied.
V.
DHEC asserts the circuit court erred in reversing the Board's remand of the renewed permits for a determination of the applicable UOD load limits for the "shoulder months." We agree.
Initially, we note the procedural posture of this case is awkward and confusing. Respondents acknowledge decreased UOD load limits apply during the critical summer months and only challenge the imposition of the lower limits during the "shoulder months." The ALJ found DHEC improperly relied on the TMDL to establish UOD load limits and this *159 ruling was not challenged by DHEC. Thus, while DHEC used the TMDL to establish the renewed permit conditions for the entire year, DHEC is barred in connection with these permits from using the TMDL to establish limits for the "shoulder months." As a result, the Board, after finding the "0.1 Rule" may be applied year-round, remanded the renewed permits to DHEC to allow UOD load limits to be imposed during the "shoulder months" without relying on the TMDL. Yet, the TMDL was used to determine the limits for the other months.
Nevertheless, pursuant to section 1-23-610(D) of the South Carolina Code (2005), the Board has authority to remand a case for further proceedings. Because we defer to DHEC's interpretation of the application of the "0.1 Rule," we necessarily reinstate the Board's remand of the permits to DHEC. DHEC must be given the opportunity to establish UOD load limits for the "shoulder months" without relying on the TMDL.
VI.
DHEC alleges the circuit court erred in finding DHEC does not have the authority to impose flow limits in an NPDES permit. We decline to address this legal issue because any ruling issued by this court would be merely advisory.
It is unchallenged that there is no factual basis for flow limits in the subject NPDES permits. The ALJ ordered DHEC to remove the flow limits from the renewed permits, and the Board affirmed this ruling. DHEC did not appeal the removal of the flow limits from the NPDES permits. Therefore, this is the law of the case. Ulmer v. Ulmer, 369 S.C. 486, ___, 632 S.E.2d 858, 861 (2006) ("A portion of a judgment that is not appealed presents no issue for determination by the reviewing court and constitutes, rightly or wrongly, the law of the case.") (quoting Austin v. Specialty Transp. Servs., 358 S.C. 298, 320, 594 S.E.2d 867, 878 (Ct.App.2004)).
The only issue concerning flow limits addressed and decided by the circuit court was whether DHEC has the legal authority to impose the flow limits. The circuit court erred in addressing this issue. Determining whether DHEC is authorized to include flow limits in an NPDES permit will have no impact on a party in a case where flow limits have been ordered to be removed from the renewed permits. We hold DHEC's inability to enforce the flow limits based on the unchallenged factual findings makes any opinion regarding DHEC's authority to impose flow limits advisory. Accordingly, this court will not address the issue.[7] See Binkley v. Rabon Creek Watershed Conservation Dist. of Fountain Inn, 348 S.C. 58, 76 n. 36, 558 S.E.2d 902, 911 n. 36 (Ct.App.2001) ("This court will not issue advisory opinions that have no practical effect on the outcome."); see also In re Chance, 277 S.C. 161, 161, 284 S.E.2d 231, 231 (1981) (noting South Carolina appellate courts have "consistently refrained" from issuing purely advisory opinions).
VII.
We find (1) the Board's interpretation of the application of the "0.1 Rule" is entitled to deference because the statute and regulation are ambiguous; (2) the Board's remand of the renewed permits to allow DHEC to determine the UOD load limits for the "shoulder months" without relying on the TMDL
*160 was proper; and (3) the circuit court erred in deciding the issue of whether DHEC has the authority to impose flow limits in an NPDES permit because the issue is not in controversy. Moreover, to the extent the issue of DHEC's legal authority to impose effluent flow limits was addressed below, all legal conclusions are vacated. The Board's order should be reinstated except for the finding regarding DHEC's authority to impose flow limits.
The decision of the circuit court is accordingly
AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, and REMANDED.
STILWELL and BEATTY, JJ., concur.

Higher UOD limits are easier for Respondents to meet; lower UOD limits are more restrictive and, therefore, more difficult for Respondents to meet.

DHEC's Exhibit 6 provides this description of the TMDL process: "The TMDL process establishes the allowable loading of pollutants or other quantifiable parameters for a waterbody based on the relationship between pollution sources and instream water quality conditions, so that the states can establish water quality based controls to reduce pollution from both point and non-point sources and restore and maintain the quality of their water resources."

Respondents raised an additional issue at the contested case hearing regarding whether requirements for whole effluent toxicity testing were properly included in the permits. The testing requirements were found proper and this finding was not challenged on appeal.

DHEC did not challenge the ALJ's rejection of the TMDL. The Board, sitting in an appellate capacity, was thus bound by the ALJ's determination in this regard. We further note that DHEC's decision to impose, or not to impose, UOD load limits for eight months of the year (other than the "shoulder months") was not challenged, although the TMDL served as the basis for DHEC's permitting decisions.

Section 1-23-610(D) was amended by Act No. 387, 2006 S.C. Acts 387; however, the applicable language at all times pertinent to the present appeal is found in section 1-23-610(D) of the South Carolina Code (2005). Pursuant to the amendment, effective July 1, 2006, DHEC administrative appeals will no longer track the awkward path followed here where the DHEC Board sits in an appellate capacity and applies the substantial evidence standard of review under the Administrative Procedures Act. See Marlboro Park Hosp. v. S.C. Dep't of Health & Envtl. Control, 358 S.C. 573, 577, 595 S.E.2d 851, 853 (Ct.App.2004) (outlining the DHEC Board's standard of review prior to the 2006 amendment). Instead, the DHEC Board will make findings of fact and its findings will be subjected to the deferential substantial evidence standard of review. Additionally, under the amendment the Board's decision will be appealed to the Administrative Law Court, which, in turn, is appealed directly to this court.

This section was also amended by Act No. 387, 2006 S.C. Acts 387; however, as above, the applicable language at all times pertinent to the present appeal is found in section 1-23-380(A)(6) of the South Carolina Code (2005).

Our decision not to address this issue is further supported by the uncertain circumstances surrounding it. If DHEC has the authority to impose flow limits in NPDES permits, as it contends, DHEC has done nothing required to promulgate this authority into a regulation. See S.C.Code Ann. § 48-1-30 (1987) (providing that DHEC is required to promulgate regulations to implement the SCPCA); see also Sloan v. S.C. Bd. of Physical Therapy Exam'rs, 370 S.C. 452, 636 S.E.2d 598 (2006) ("In order to promulgate a regulation, the APA generally requires a state agency to give notice of a drafting period during which public comments are accepted on a proposed regulation; conduct a public hearing on the proposed regulation overseen by an administrative law judge or an agency's governing board; possibly prepare reports about the regulation's impact on the economy, environment, and public health; and submit the regulation to the Legislature for review, modification, and approval or rejection.") (citing S.C.Code Ann. §§ 1-23-110 to-160 (2005 and Supp. 2005)). Conversely, DHEC argues it can apply flow limits as it chooses because its action does not establish a "binding norm." Yet, DHEC has provided this court with no standard setting forth the conditions under which DHEC will impose the flow limits.