764 S.E.2d 712

**DUKE ENERGY CORPORATION, Appellant,**

v.

**SOUTH CAROLINA DEPARTMENT
OF REVENUE, Respondent.**

Appellate Case No. 2012–213180.

Nos. 2012–213180, 5274.

Court of Appeals of South Carolina.

Heard Feb. 18, 2014.
Filed Oct. 8, 2014.
Rehearing Denied Nov. 21, 2014.

416

Eric S. Tresh and Maria M. Todorova, both of Atlanta, GA, and Jeffrey A. Friedman, of Washington, DC, all of Sutherland Asbill & Brennan, LLP, and Burnet Rhett Maybank, III and Tanya Amber Gee, Nexsen Pruet, LLC, both of Columbia, for Appellant.

Tracey Colton Green, John Marion S. Hoefer, and John William Roberts, Willoughby & Hoefer, PA, all of Columbia, Jonathon Abraham Gutting, Young Clement Rivers, LLP, of Charleston, Milton Gary Kimpson, of Columbia, and Harry A. Hancock, of Bordentown, NJ, for Respondent.

FEW, C.J.

This appeal arises from Duke Energy Corporation's claims to the South Carolina Department of Revenue for corporate income tax refunds totaling $126,240,645, plus interest, for tax years 1978 to 2001. We affirm the denial of Duke Energy's refund claims.

## I. Facts and Procedural History

Duke Energy generates electricity and sells it to customers. Because it does business in North Carolina and South Carolina, Duke Energy must apportion its income between these states to determine the income tax due to each state. *See* S.C.Code Ann. § 12–6–2210(B) (2014) ("If a taxpayer is transacting or conducting business partly within and partly without this State, the South Carolina income tax is imposed upon a base which reasonably represents the proportion of the trade or business carried on within this State.").[1] A taxpayer's

---

1. This section was enacted in 1995. Act No. 76, 1995 S.C. Acts 460. Prior to tax year 1996, the apportionment of a taxpayer's income between states was governed by the predecessor to section 12–6–2210— South Carolina Code section 12–7–250 (1976), which was located in Article 9 of the now-repealed Chapter 7 of Title 12 in the Income Tax Act of 1926. *See* Act No. 76, 1995 S.C. Acts 536 (stating "this act is effective for taxable years beginning after 1995"); Act No. 76, 1995 S.C.

income is apportioned using a formula—a fraction—in which the numerator represents the business the taxpayer did in the applicable tax year in this state, and the denominator indicates the total business the taxpayer did in all states. The South Carolina Income Tax Act provides two formulas: (1) the formula applicable to "manufacturers," which contains three factors in both the numerator and the denominator—property, sales, and payroll, S.C.Code Ann. § 12–6–2252 (2014);[2] and (2) the formula applicable to all other taxpayers, which contains only one factor—sales, S.C.Code Ann. § 12–6–2290 (2014).[3] In either formula, the business of the taxpayer in this state is converted to a fraction of its total business, which becomes the "base" upon which the taxpayer's state income tax is calculated.

Duke Energy filed timely income tax returns for each of the tax years at issue—1978 to 2001. In December 2002, Duke Energy filed amended tax returns for each of these years. Duke Energy sought to have its South Carolina income tax recalculated and requested refunds in the amount of $126,240,645, plus interest. In February 2003, the department denied the requests. In March 2003, Duke Energy appealed this decision to the department's Office of Appeals. The department did not act on the appeal until February 2010—

Acts 535 (repealing "Chapter[ ] 7 ... of Title 12 of the 1976 Code"). The wording of the former and current versions of the section differs slightly, but the effect of the sections is the same.

2. Section 12–6–2252 applies to more than just manufacturers, as we discuss in section III of this opinion. Section 12–6–2252 was enacted in 2007. Its language, however, is identical to the predecessors that apply to this case: (1) former section 12–7–1140 (1976), which applied to tax years 1978 to 1995; and (2) former section 12–6–2250 (2000), which applied to tax years 1996 to 2001. Section 12–7–1140 was repealed and section 12–6–2250 was enacted in 1995. Act No. 76, 1995 S.C. Acts 461, 535. Section 12–6–2250 was repealed in 2007 when section 12–6–2252 was enacted. Act No. 110, 2007 S.C. Acts 590, 595.

3. Section 12–6–2290 was enacted in 1995, see Act No. 76, 1995 S.C. Acts 464, and amended in 2007, see Act No. 110, 2007 S.C. Acts 594, 595. The predecessor to section 12–6–2290 was South Carolina Code section 12–7–1190 (1976), which was effective in all tax years before 1996. Section 12–7–1190 was repealed when section 12–6–2290 was enacted in 1995. Act No. 76, 1995 S.C. Acts 535.

almost seven years—when it issued a "determination" denying the appeal.

Duke Energy filed a contested case in the administrative law court ("ALC"). The ALC faced three primary issues: (1) whether Duke Energy's refund claims were timely, (2) which apportionment formula Duke Energy was required to use, which we refer to as the "manufacturing" issue, and (3) whether Duke Energy could include in the denominator of the applicable formula its gross receipts from sales of certain short-term investments, which we refer to as the "gross receipts" issue. The department moved for summary judgment on all three issues, and Duke Energy moved for summary judgment on the gross receipts issue. The ALC granted partial summary judgment to the department, ruling Duke Energy's refund claims were untimely for tax years 1978 to 1993,[4] and Duke Energy may not include gross receipts in the denominator of the applicable apportionment formula. The ALC then conducted a trial on the question of which formula Duke Energy must use and ruled for the department, finding Duke Energy must use the formula set forth in section 12–6–2252.

We find the ALC properly granted summary judgment to the department because it correctly determined Duke Energy may not include its gross receipts from sales of short-term investments. We also affirm the ALC's ruling that Duke Energy must use the apportionment formula in section 12–6–2252. Because our resolution of these issues is dispositive of this appeal, we do not reach the timeliness of Duke Energy's refund claims. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (explaining an appellate court need not address remaining issues when the court's resolution of the issues it does address are dispositive of the appeal).

## II. Standard of Review

We review the ALC's decision under subsection 1–23–610(B) of the South Carolina Code (Supp.2013). The gross receipts

---

4. The department concedes Duke Energy's refund requests for tax years 1994 to 2001 were timely due to the enactment of South Carolina Code subsection 12–60–470(A) (2014). Act No. 60, 1995 S.C. Acts 375–76.

issue is a pure question of law that the parties presented to the ALC on cross motions for summary judgment. Thus, we review the ALC's decision as to that issue under subsections 1–23–610(B)(a), (c), and (d). *See Doe ex rel. Doe v. Wal–Mart Stores, Inc.*, 393 S.C. 240, 244, 711 S.E.2d 908, 910 (2011) ("Summary judgment is appropriate when there is no genuine issue of material fact such that the moving party must prevail as a matter of law."); *Alltel Commc'ns, Inc. v. S.C. Dep't of Revenue*, 399 S.C. 313, 319 n. 2, 731 S.E.2d 869, 872 n. 2 (2012) ("[T]he parties filed cross motions for summary judgment, thereby indicating the parties' belief that further development of the facts was unnecessary."); *id.* ("[C]ross motions for summary judgments . . . authorize the court to assume that there is no evidence which needs to be considered other than that which has been filed by the parties." (alteration in original) (citation omitted)); *Wiegand v. U.S. Auto. Ass'n*, 391 S.C. 159, 163, 705 S.E.2d 432, 434 (2011) ("Where cross motions for summary judgment are filed, the parties concede the issue before us should be decided as a matter of law.").

■■ As to the manufacturing issue, the ALC decided the question after a trial. Both parties, as well as the ALC, address the question as one of fact. However, we find the manufacturing issue to be primarily one of statutory interpretation in which the facts are undisputed. To this extent, we review the ALC's ruling as a question of law under subsections 1–23–610(B)(a), (c), and (d). *Centex Int'l, Inc. v. S.C. Dep't of Revenue*, 406 S.C. 132, 139, 750 S.E.2d 65, 69 (2013) (stating "questions of statutory interpretation are questions of law"); *Town of Summerville v. City of N. Charleston*, 378 S.C. 107, 110, 662 S.E.2d 40, 41 (2008) (stating "the proper interpretation of a statute is a question of law"). However, we review under a different standard the ALC's ruling that Duke Energy's "manufacturing" business is its "principal" business in South Carolina. In making this ruling, the ALC resolved a factual dispute as to the appropriate inferences that should be drawn from undisputed facts. Therefore, we review this ruling as a factual determination under subsection 1–23–610(B)(e) and must determine if it is "clearly erroneous in view of the reliable, probative, and substantial evidence." *See ESA Servs., LLC v. S.C. Dep't of Revenue*, 392 S.C. 11, 24, 707 S.E.2d 431, 438 (Ct.App.2011) (stating "as to [the ALC's]

findings of fact, we may reverse or modify decisions that ... are clearly erroneous in view of the substantial evidence"); *Commis. of Pub. Works v. S.C. Dep't of Health & Envtl. Control*, 372 S.C. 351, 358, 641 S.E.2d 763, 766–67 (Ct.App. 2007) (stating "we may not substitute our judgment for that of the AL[C] as to the weight of the evidence on questions of fact unless the AL[C]'s findings are clearly erroneous in view of the reliable, probative and substantial evidence").

### III.  The Manufacturing Issue

The central question regarding the manufacturing issue is whether the predecessors to section 12–6–2252 apply to Duke Energy.  Section 12–6–2252 reads:

> A taxpayer whose principal business in this State is (i) manufacturing or a form of collecting, buying, assembling, or processing goods and materials within this State, or (ii) selling, distributing, or dealing in tangible personal property within this State, . . . .

If Duke Energy's principal business is considered "manufacturing," section 12–6–2252 applies and Duke Energy must use an apportionment formula based on three factors—property, sales, and payroll.  If, however, its principal business is not manufacturing, or does not otherwise fall under section 12–6–2252, then section 12–6–2290 and its predecessors apply, which permits Duke Energy to use a formula based only on sales.

Both parties agree Duke Energy's business in South Carolina is the production and delivery of electrical power to homes and businesses.  The ALC stated the parties stipulated "[Duke Energy] is, and was during the 1978–2001 tax periods, engaged in the generation, transmission, distribution, and sale of electricity."  Duke Energy characterizes its business as "the provision of electric service to its customers," while the department characterizes it as "the generation, transmission, distribution, and sale of electricity," and simply "providing electricity."  Each of these variations accurately describes Duke Energy's business, and there is no dispute as to what Duke Energy does.  The only dispute is how Duke Energy's business should be classified under the state tax laws—particularly under sections 12–6–2252 and 12–6–2290, and their predecessors.

"Manufacturing" is not defined in the tax code. We find, however, Duke Energy's undisputed activity meets the plain and ordinary meaning of the word. *See Travelscape, LLC v. S.C. Dep't of Revenue*, 391 S.C. 89, 99, 705 S.E.2d 28, 33 (2011) ("When faced with an undefined statutory term, the Court must interpret the term in accordance with its usual and customary meaning."). According to Webster's New Collegiate Dictionary, "manufacture" is defined as "to make into a product suitable for use," and "to produce according to an organized plan and with division of labor." *Webster's New Collegiate Dictionary* 695 (spec. ed. 1981). The ALC defined manufacturing as "the process of making wares by hand or by machinery especially when carried on systematically with division of labor," "productive industry using mechanical power and machinery," and "the act or process of producing something."

The ALC discussed the nature of Duke Energy's business, stating,

> Duke Energy operates plants in both South Carolina and North Carolina to produce electricity. In South Carolina, Duke Energy has two nuclear power plants, four coal power plants, three hydroelectric power plants, and several oil or gas power plants. The electricity that is produced and consumed by its customers is created at Duke Energy generation facilities. A generator is a "mechanical device" that uses mechanical energy to produce electric energy or, as it is more commonly known, electricity. Generators have been used to produce electricity in substantially the same manner for over 100 years. Many, though not all, of Duke Energy's generation facilities use a turbine driven by steam power to turn the generator. Although the sources or inputs (e.g., coal, uranium, water) used at these different types of generation facilities may vary, all use a generator to produce electricity. The result, however, is the same: Duke Energy employs a mechanical device to produce and generate electricity using a process that has not changed significantly since the early 20th century.

As described by the ALC, Duke Energy utilizes mechanical power, usually to generate steam, which is then used to create electricity. We find Duke Energy's business fits the definitions of "manufacture" stated above. Although Duke Energy

would disagree with the word "create," it is undisputed that Duke Energy generates electricity, or an electrical charge, that did not previously exist. As the ALC stated, "No matter what moniker [is] used to describe the product produced by Duke Energy, the electric current that generates that field, or even the field itself, is produced through a mechanical process run by Duke Energy." We therefore hold that what Duke Energy does to generate electricity is "manufacturing" as that term is used in section 12–6–2252.

Our conclusion is supported by previous decisions of our supreme court, in which the court defined "manufacturer" and "manufactory" and held Duke Energy and other electric utilities to be manufacturers, for purposes of the tax code. In *Columbia Railway, Gas & Electric Co. v. Query*, 134 S.C. 319, 132 S.E. 611 (1926), an electric company challenged a tax assessed against it under the "Manufacturer's Tax Act." 134 S.C. at 321, 132 S.E. at 612. The circuit court upheld the tax assessment, and on appeal, "the single question [was] whether the plaintiff is 'engaged in the business of manufacturing,' with reference to its gas and power business." *Id.* The supreme court affirmed, stating, "We do not think that there is any doubt that the appellant is engaged in the business of manufacturing gas and electricity...." 134 S.C. at 324, 132 S.E. at 612. Duke Energy argues the *Columbia Railway* decision is distinguishable because it was "issued in other contexts more than eighty years ago" and "under a different set of tax statutes." We disagree and find *Columbia Railway* is controlling.

In *Duke Power Co. v. Bell*, 156 S.C. 299, 152 S.E. 865 (1930), our supreme court made a specific determination that Duke Energy is a manufacturer. 156 S.C. at 304–06, 152 S.E. at 868. Relying on *Columbia Railway*, the *Bell* court addressed whether a state law that exempted "manufactories" from county taxes applied to an electric power plant acquired by Duke Energy. 156 S.C. at 304–05, 152 S.E. at 867–68. The court explained the power plant constituted a "manufactory," stating,

> The word "manufactory" means, primarily, a physical plant, or a place or building, where manufacturing is carried on. If a company engaged in the generation of electricity is a "manufacturer" for the purposes of a statute imposing a tax,

the plant or structure wherein the process of generating such electricity is carried on is a *manufactory* for the purposes of a tax exempting statute.

156 S.C. at 306, 152 S.E. at 868. *Bell* is important for two reasons: (1) it applied directly to Duke Energy, and (2) the court relied on *Columbia Railway* in a different context of tax law.

Because we find Duke Energy is a "manufacturer" of electricity, we need look no further than the introductory words of section 12–6–2252—"A taxpayer whose principal business in this State is (i) manufacturing"—to determine it applies to Duke Energy. Duke Energy argues, however, section 12–6–2252 is inapplicable because it does not manufacture anything "tangible," and the terms of section 12–6–2252 apply only if the taxpayer manufactures something tangible. Duke Energy points to the "goods and materials" language of section 12–6–2252 to argue it applies only to taxpayers whose business is "manufacturing . . . goods and materials." Thus, Duke Energy contends the statute does not apply to it unless electricity is physical or tangible.

We do not believe the outcome of this appeal should turn on whether electricity is "tangible." First, as we previously explained, our supreme court has ruled the production of electricity is manufacturing, and Duke Energy is a manufacturer. *See Bell*, 156 S.C. at 306, 152 S.E. at 868; *Columbia Railway*, 134 S.C. at 324, 132 S.E. at 612. Those rulings are not distinguishable, and therefore binding on us. Second, the word "manufacturing" in subsection 12–6–2252(A) stands alone. Duke Energy argues the phrase "goods and materials within this State" and the words "tangible personal property" in subsection 12–6–2252(A) modify "manufacturing" so that the statute applies only when the taxpayer manufactures a tangible good or product. We read "goods and materials within this State" to modify only "collecting, buying, assembling, or processing." Further, we find the words "tangible personal property" in subsection (A)(ii) should not be read to modify the word "manufacturing" in subsection (A)(i).

Duke Energy and the department extensively address in their briefs the question of whether electricity is "tangible personal property" under section 12–6–2252, and the ALC

went to great lengths to justify its conclusion that "[e]lectricity is a physical product with physical characteristics." Given our conclusion regarding this issue, however, we reject Duke Energy's argument that the intangible quality of electricity renders section 12–6–2252 inapplicable.

We also base our holding on the intent of the Legislature in drafting section 12–6–2252. Subsection 12–6–2210(B) provides "the South Carolina income tax is [to be] imposed upon a base which reasonably represents the proportion of the trade or business carried on within this State." Section 12–6–2252 contemplates that, for some businesses, considering sales alone will not yield an allocation of income between states that "reasonably represents the proportion of the trade or business carried on within this State." § 12–6–2210(B). This is true of businesses that sell in other states a high percentage of the product they manufacture in this state. Those businesses have a more significant presence in South Carolina—i.e. "the proportion of the trade or business carried on within this State"—than their sales here reflect. Under that circumstance, the Legislature indicated its intent to consider capital investment and employment in this state, in addition to sales. Applied to this situation, we hold the Legislature intended a taxpayer like Duke Energy, whose business depends on significant capital investment and employment, to apportion "the trade or business [it] carrie[s] on within this State" using the multi-factor apportionment formula. In this case, calculating the apportionment based on sales alone would not reasonably represent the taxpayer's business because Duke Energy has significant capital investment and employment in South Carolina. Thus, for the same reasons the Legislature drafted section 12–6–2252 to apply to any manufacturer, the section applies to Duke Energy.

Duke Energy also argues it provides a "service" under section 12–6–2290, and thus it should have its income tax apportioned according to the formula in that section. We agree the usual and customary meaning of "service" includes selling electricity. In its order, the ALC initially began its discussion of the manufacturing issue by referring to Duke Energy's "service" of electricity:

> The metered *service* plan is based on usage,.... Regardless of the *service* plan, a portion of each Duke Energy customer's *service* charge recovers Duke Energy's costs associated with maintaining the infrastructure that Duke Energy uses *to provide electric service.*

(emphasis added). Additionally, the department's own expert witness testified Duke's provision of electricity on a flat-fee basis is a service. Thus, Duke Energy is fairly characterized as a "manufacturer" that provides electric "service." We do not believe, however, that Duke Energy's provision of electric service changes its status as a manufacturer or the applicability of section 12–6–2252.

Sections 12–6–2252 and 12–6–2290 require the court to focus on the taxpayer's "principal" business. Duke Energy argues we should determine which component of Duke Energy's business is manufacturing and which is service, and from that conclude Duke Energy's "principal business in this State" is providing a service. We disagree for the reasons explained above—Duke Energy is a manufacturer and section 12–6–2252 applies to manufacturers. Even if we were to accept Duke Energy's argument, however, we must affirm. The ALC found, "After considering the evidence in the record and the pertinent legal authorities, ... Duke Energy has failed to establish by the preponderance of the evidence that its principal business in South Carolina is not manufacturing...." The ALC's finding is supported by substantial evidence, the most important of which is (1) Duke Energy's charter, which states it is a "manufacturer," and (2) Duke Energy's designation of itself as a manufacturer in its original tax return for each of the tax years applicable to this appeal. *See Commis. of Pub. Works,* 372 S.C. at 358, 641 S.E.2d at 766–67 (Ct.App.2007) ("[W]e may not substitute our judgment for that of the AL[C] as to the weight of the evidence on questions of fact unless the AL[C]'s findings are clearly erroneous in view of the reliable, probative and substantial evidence.").

## IV. The Gross–Receipts Issue

■ Regardless of which formula is used to apportion a taxpayer's income between states, the formula contains a variable in its denominator for the taxpayer's sales from all states in which it does business. Under either formula, the

larger the denominator, the less income tax the taxpayer owes in this state.

For the multi-factor formula in section 12–6–2252, which we hold is applicable to Duke Energy, the "sales factor" is defined as "a fraction in which the numerator is the total sales of the taxpayer in this State during the taxable year and the denominator is the total sales of the taxpayer everywhere during the taxable year." S.C.Code Ann. § 12–6–2280(A) (2014).[5] Duke Energy takes the position the denominator should include gross-receipts from the sale of short-term investment instruments that Duke Energy purchases from other entities. The department disagrees, arguing the denominator should include only the smaller net receipts. The definition of "sales" in section 12–6–2280 does not include the term "gross receipts." However, the definition does include "sales of intangible personal property." [6]

To understand whether Duke Energy's gross receipts from sales of short-term investments should be included in the formula, it is helpful to examine the investment transactions at issue. According to Sherwood L. Love, Duke Energy's Assistant Treasurer and General Manager of Long Term Investments, Duke Energy maintained a Cash Management Group within its treasury department that "provide[d] required liquidity support for Duke['s] commercial paper programs ... for the short-term funding of additional electric generation, transmission and distribution facilities[.]" The Cash Management Group carried out this objective by "invest[ing] Duke['s] excess operating cash in various short-term marketable securities." These securities included municipal bonds, loan repurchase agreements, commercial paper, U.S. Treasury securi-

---

**5.** Section 12–6–2280 was enacted in 1995 and amended in 2007. Act No. 76, 1995 S.C. Acts 463; Act No. 110, 2007 S.C. Acts 593; *see also* Act No. 116, 2007 S.C. Acts 739 (duplicate of Act 110 in amending this section). Prior to tax year 1996, former South Carolina Code section 12–7–1170 (1976) provided that the sales factor consists of "[t]he ratio of sales made by such taxpayer during the income year which are attributable to this State to the total sales made by such taxpayer everywhere...."

**6.** The definition of "sales" in section 12–6–2280 is essentially the same as the definition in former section 12–7–1170, applicable before tax year 1996. The words are arranged differently, but the concept is the same.

ties, and agency securities. According to Mr. Love, Duke Energy made these short-term investments "[p]retty much every day," and Duke Energy "typically [left] investments like this outstanding for [less] than 30 days."

Mr. Love provided the details of one particular transaction, which we find useful to illustrate how the transactions worked in general. This representative transaction consisted of the following actions taken by Duke Energy: (1) investing $14,982,900 in a short-term instrument on August 7, 1996, (2) selling the instrument eight days later on August 15, (3) collecting $17,100 in interest, and then immediately reinvesting the total $15,000,000 in another short-term instrument. This transaction demonstrates that Duke Energy's argument is contrary to the legislative intent of the apportionment statutes.

Under Duke Energy's theory, the transaction described above yields a $15 million dollar receipt that Duke Energy may use in the denominator of the apportionment formula. However, if Duke Energy decided to sell the instrument on August 10, immediately reinvest the money, and sell the second instrument on August 15, its "gross receipt" would be $30 million. If Duke Energy sold and reinvested the money on August 9, August 11, August 13, and August 15—a scenario Mr. Love testified was entirely reasonable—Duke Energy's "gross receipt" would be $60 million. These slight variations on this representative transaction illustrate that allowing Duke Energy to include its gross receipts from short-term investment instruments would artificially reduce the "base which reasonably represents the proportion of the trade or business carried on within this State," *see* § 12–6–2210(B), by artificially inflating the denominator of the formula.

The ALC focused on the fact that the return of the principal from this and other similar transactions is not part of Duke Energy's "gross income." We find, however, the issue does not depend on the difference between "gross" and "net" receipts. Instead, the issue turns on whether the return of the principal of these investments is properly characterized as a "receipt" in the first place. Stated another way, the issue is whether the receipt Duke Energy received from these trans-

actions is the total amount, including principal and return on investment, or just the return.

Generally, a "receipt" is "something received," *Webster's, supra,* at 956, and usually refers to money. In the business context, "receipt" means money the business receives for its products or services—for what it does in its business.[7] Duke Energy is in the business of selling electricity, which includes the sale of electricity itself on a wholesale or retail basis or the sale of capital it uses to conduct its business, such as a power plant. The money it takes in from such a sale is properly considered a "receipt." When Duke Energy invests the proceeds of its business in a short-term financial instrument and sells the investment for a profit, the profit generated may be considered a receipt. However, the principal of the investment is its own money—not money it received for its products or services. Thus, the return of the principal is not a receipt.

We affirm the ALC's determination that Duke Energy may not include gross receipts from the sale of short-term investments in the denominator of the formula used to apportion its income.

## V. Conclusion

We find the ALC correctly ruled (1) Duke Energy is a "manufacturer" and thus must apportion its South Carolina income using the formula in section 12–6–2252; and (2) its gross receipts from sales of short-term investments in other states may not be included in the denominator of the formula. Because our conclusions as to these two issues resolve the appeal, we need not address the timeliness of Duke Energy's refund claims. *See Futch,* 335 S.C. at 613, 518 S.E.2d at 598. We **AFFIRM.**

SHORT and GEATHERS, JJ., concur.

---

7. Duke Energy recites a similar definition from a decision of the tax commission: "gross receipts is a broad term which includes all proceeds received by the entity so long as such receipts resulted from any part of its business."